UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**CASE NO. 17-14415-CIV-MAYNARD**

**PATRICIA A. O'BRIEN,**

        **Plaintiff,**

**v.**

**NANCY A. BERRYHILL, Acting Commissioner,
Social Security Administration,**

        **Defendant.**

_____/

FILED by _____ D.C.

SEP 2 6 2018

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. PIERCE

**ORDER ON THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT (DE 16 & 18)**

**THIS CAUSE** comes before this Court upon the above Motions.
Having reviewed the Motions and the Administrative Record, and
having held a hearing thereon on September 18, 2018, this Court
finds as follows:

**BACKGROUND**

1.   The Plaintiff applied for disability insurance
benefits under Title II of the Social Security Act with a
protective filing date of April 30, 2013. The application was
denied at the first two levels of administrative review. On
August 3, 2016, following a hearing, an Administrative Law Judge
("ALJ") rendered a decision finding the Plaintiff not disabled
under the terms of the Social Security Act. The Appeals Council
denied the Request for Review on June 20, 2017, thereby leaving
the ALJ's decision final and subject to judicial review.

2.    In January 1999 the Plaintiff began working for a chimney cleaning company doing telephone solicitations. In January 2003 she opened her own printing company. For a while at first she worked both jobs. As for her printing company, she did all of the work for it including the physically demanding parts and making deliveries.

3.    The medical record begins on March 4, 2008 when she began treatment at the Stony Brook Family Medicine practice. The Plaintiff reported a ten year history of chronic low back pain that she attributed to a herniation at the L4—5 disc site. However she was seeking relief now for a recent acute exacerbation of low back pain with pain that radiates down her left leg. It was not from an injury event but rather she simply pulled her back while waking up that morning. The physical examination was positive for pain manifestations. She was 42 years old at the time.

4.    She went to the Stony Brook Family Medicine practice frequently that month for treatment and pain relief for that acute pain. An MRI taken on March 13th showed a small herniation at the L3—4 disc without stenosis or nerve root compression; a herniation at L4—5 that compresses the left side of the L5 nerve root; and a slipped disc (spondylolisthesis) at L5—S1 of just Grade I severity and without nerve root compression. (That MRI

is found in the Administrative Record at page 331 and again at page 403.) A nerve conduction study was undertaken, and it revealed signs suggestive of (1) the very early onset of acute radiculopathy, possibly affecting the left nerve root at the L5— S1 disc and (2) very minimal innervation affecting her left leg.

5.   A second MRI was taken of the Plaintiff's lumbar spine on March 31st (found at page 317). Its findings are similar to what the earlier March 13th MRI showed. This second MRI showed a small herniation at the L3—4 disc (now with some, albeit mild, stenosis); a herniation at the L4—5 disc with just the potential of left-sided nerve root compression; and Grade I spondylolis-thesis at L5-S1 with mild to moderate canal compression.

6.   Over the course of March and into April of 2008, the Plaintiff's treating doctors at the Stony Brook practice substantially increased the Plaintiff's pain medications. The Plaintiff was complaining of very severe pain and left leg radiculopathy, and within a month of first seeking treatment, her pain medication regimen expanded to include Percocet and morphine. Her diagnoses likewise expanded to include anemia, constipation, and fatigue. At this point in time the Plaintiff expressed the preference for opioids as her primary treatment means. The record shows only one physical therapy session, with Ms. Abrams on April 10, 2008. On June 10th the Plaintiff saw Dr.

Wani for pain management services. He added Lyrica to her pain medication regimen with the anticipation that it would ease her neuropathy, reduce her pain, and increase her daily life activities.

7.    In June 2008 the Plaintiff expressed interest in surgery for which she saw Dr. Lokshina for a neuro-surgery evaluation on June 30th. Dr. Lokshina diagnosed lumbar radiculopathy and herniation. He recommended a broad range of conservative treatment measures consisting of physical therapy, cognitive therapy, weight loss, epidural steroid injections, and pain medications. He also recommended a neuro-surgery consultation (although he, himself, is a neurosurgeon).

8.    In July 2008 she reported to her doctors at Stony Brook that another doctor, an orthopedist, had prescribed her Percocet after she had fallen in the yard. She now was asking for Percocet refills, but the Stony Brook doctors declined to prescribe them. The Plaintiff did not return to the Stony Brook practice thereafter.

9.    From that point forward she saw only her pain management doctor, Dr. Wani, for medical care. The Plaintiff continued to complain of low back pain with pain radiculopathy down her left leg (and she consistently would complain of such for the rest of the treatment history). (She also came wearing a

cast after fracturing her right ankle two weeks prior.) Upon examination Dr. Wani observed stiffness and tenderness in the Plaintiff's lumbar muscles. He diagnosed chronic low back pain with associated lumbar disc degeneration and possible radiculopathy.

10. Dr. Wani discontinued the "shotgun therapy" approach to the pain medication treatment that the Stony Brook doctors had pursued. Dr. Wani therefore re-adjusted her pain medication regimen. For a while Dr. Wani continued to prescribe OxyContin, but beginning in April 2009 he prescribed just the non-opioid pain medications of Robaxin (a muscle relaxer), Neurontin, Lyrica, and Ultram. At first Dr. Wani also administered trigger point injections as treatment for her myofascial pain. The Plaintiff saw Dr. Wani on a monthly basis from June 2008 to December 2009.

11. There is a gap in treatment between December 2009 and April 2012. In 2010 the Plaintiff stopped declaring taxable income. The ALJ notes how that stop in taxable income happened several years before her date last worked of March 29, 2013.

12. The exception to the gap in treatment occurred in mid 2011 when the Plaintiff saw Dr. Strittmatter for medical clearance for surgery. Clearance was given and surgery was scheduled for August 2011. The nature of that surgery is

unknown. There is also a treatment note from a Dr. Kamdar, from May 2011. It suggests ongoing complaints of back and leg pain as well as ongoing prescriptions for Neurontin, Tramadol, and Flexeril.

13.    The medical record resumes in April 2012. April 24, 2012 was the Plaintiff's second visit to Dr. Selter for pain medication refills. She complained of back pain, paraspinal muscle pain, and leg pain. She also complained of pain in her upper extremities (in her left arm, right elbow, and across her shoulder blades) as well as swelling and numbness in her hands for which carpal tunnel syndrome was diagnosed.

14.    An MRI of the Plaintiff's lumbar spine was taken on July 18, 2012 (and is found at page 419 in the Administrative Record). It appears to have been requested by a doctor, Dr. Moreta, who is not of record. It shows protrusions at the L3—4, L4—5, and L5—S1 discs as well as minimal spondylolisthesis at the L5—S1 disc with mild canal impingement. Presumably it was this MRI that Dr. Guo later read as showing mild degeneration.

15.    In July 2012, on Dr. Selter's referral, the Plaintiff saw Dr. Rauchwerger, a pain management doctor. She continued to have the same pain complaint of low back pain and pain radiculopathy down her left leg. Dr. Rauchwerger ordered an MRI of the Plaintiff's lumbar spine. That MRI---the second

undertaken in July 2012---was performed on July 24th (and is
found at page 416). It shows mild degeneration at the L3—4 disc;
protrusion at the L4—5 disc with compression of the left L5
nerve root; and Grade I spondylolisthesis at the L5—S1 disc with
moderate stenosis. The radiologist observed no change from the
previous MRI of March 13, 2008. Dr. Rauchwerger continued the
Plaintiff's prescriptions for Flexeril, Tramadol, and Neurontin.

16.    In August 2012 the Plaintiff went to the Port
Jefferson Family Practice for a follow-up on her blood work. She
came wearing a carpal tunnel brace on her left hand, and she
complained of pain in both hands. She also complained of daily
headaches, and she requested a cardio stress test. The attending
doctor prescribed Celebrex and Elavil.

17.    At the October 2012 appointment with Dr. Rauchwerger,
the Plaintiff complained about how increased work activity had
worsened her pain. She also complained of right foot pain after
using it to sweep up her grandson's toys. Dr. Rauchwerger noted
how the previous lumbar MRI had shown herniation with
compression of the left nerve root.

18.    In February 2013 the Plaintiff began seeing Dr.
Shepherd for left leg numbness and hand pain. Upon examination
Dr. Shepherd observed decreased sensation in the Plaintiff's

left lower extremity and swelling in her hands. He diagnosed carpal tunnel syndrome and radiculitis.

19. A few days later the Plaintiff saw Dr. Guo for a neurology consultation. His examination of the Plaintiff was normal. Dr. Guo diagnosed low back pain syndrome, spinal radiculopathy, polyneuropathy, and carpal tunnel syndrome. Nerve conduction studies were performed in March 2013. The one of her upper extremities and hands were normal. The one of her lower extremities showed active chronic left-sided radiculopathy coming from the L5 disc with reinnervation in her lumbar muscles and left leg. The treatment with Dr. Shepherd and Dr. Guo happened right before her date last worked and alleged disability onset date in late March.

20. Also of note, the period of the Plaintiff's Title II disability insurance coverage ran out on March 31, 2013. In order for the Plaintiff to qualify for Title II benefits, she must establish the onset of disability on or before March 31, 2013. The ALJ did not include in his consideration the medical evidence generated after March 31, 2013. For the sake of thoroughness this Court includes those later medical records in its discussion here.

21. The Plaintiff saw Dr. Guo on April 9th, complaining of severe lumbar pain. The physical examination was normal. The

Plaintiff continued her prescriptions for Neurontin, Flexeril, and Tramadol. It also was noted that the Plaintiff was receiving pain management services at "SSNA"; it is unknown to what provider that notation refers.

22.   In May 2013 the Plaintiff first began the application process for Social Security disability benefits (for which the ALJ calculated April 30th as the protective filing date.) She alleged disability from severe low back pain and left leg radiculopathy. She attributed the pain to three herniated lumbar discs with compression of the L5 nerve root.

23.   On May 31, 2013 the Plaintiff went to Dr. Shepherd to ask him to fill out paperwork for her disability application. (That provider submitted no disability forms into the record.) The Plaintiff explained that chronic pain had left her unable to perform the physical demands of her printing business. Upon physical examination Dr. Shepherd observed lumbar radiculopathy but without sensory or motor loss. Dr. Shepherd continued her prescriptions for Tramadol, Neurontin, and Flexeril. A month later, Dr. Guo noted pain and spasm in the paraspinal muscles across the Plaintiff's lumbar spine. The Plaintiff denied being able to afford physical therapy.

24.   All of the above medical care was provided in New York. In early summer 2013 the Plaintiff moved to Florida. The

medical record in Florida begins on July 22, 2013 when she went
to the hospital for an injured right knee. She said that her
right knee had given out, causing her to fall, and she sought
treatment for pain and swelling in that knee. An MRI showed
relatively non-severe injury.

25. The Plaintiff did not establish treatment with a new
primary care physician in Florida. Instead she went to the
Health Department for her medical care. She went three times on
July 25th, August 29th, and December 3rd for a variety of
complaints including low back pain. The Health Department
continued her prescriptions for Tramadol, Neurontin, and
Flexeril.

26. On September 3, 2013 the Plaintiff's private
disability insurer granted her claim for those disability
benefits, with a disability date starting April 2, 2013. That
letter is not part of the Administrative Record. Instead the
Plaintiff proffers it into the record as an attachment to her
Complaint. The Plaintiff also mentioned it at this Court's
telephonic hearing. Although not part of the Administrative
Record, this Court includes it here for the sake of thoroughness
and because the Plaintiff includes it in her arguments. Even if
it were part of the record, it would not affect the outcome of
this ruling. Other insurers' disability decisions generally have

10 of 23

little relevance to the question of disability entitlement as Social Security law defines it.

27. She went to the Health Department more frequently between May and December of 2014. She continued to receive medical care for a variety of conditions which now included such gastro-intestinal conditions as a small gallstone, GERD, a mildly swollen liver, and thrombocytosis. The December 2014 treatment note shows treatment also provided for low back pain, pain radiation down her left leg, and stiffness in both hands. The lumbar conditions of lumbago, spondylitis, and chronic disc disorder with myelopathy were diagnosed as was arthritis. Also at that December 2014 appointment the Plaintiff asked for disability paperwork to be filled out. (The Administrative Record contains no such paperwork, however, this Court notes.)

28. The Plaintiff went to the hospital on February 2015. She complained that she lacked enough feeling in her foot to feel the blister that her flip-flop shoe had caused there. Testing showed no peripheral vascular disease.

29. In May 2015 the Plaintiff reported to Dr. Bradley that she wears compression socks to help ease lower extremity swelling. She complained that her recently increased Neurontin dose made her drowsy. Of note the physical examination was

normal. Dr. Bradley diagnosed limb pain and neuropathy, and he
refilled her pain medications, adjusting the Neurontin dose.

30.  The Commissioner sent the Plaintiff to Dr. Henderson
for a consultative physical examination on August 27, 2015. Dr.
Henderson described the Plaintiff as a poor historian of her
back pain history, with difficulty staying on subject. The
Plaintiff also was emotional throughout the examination. (This
Court notes that no treating source reported observing the
same.) Dr. Henderson observed the Plaintiff to walk with a limp
and to have a decreased range of lumbar motion, decreased
sensation in her left lower extremity, mild difficulty with heel
and toe walking, and moderate difficulty with squatting and
arising from a seated position. He observed no paraspinal
spasms, however, and the Plaintiff moved on and off the
examination table without difficulty. Dr. Henderson diagnosed
low back pain with history of radiculopathy.

31.  Dr. Henderson also filled out a questionnaire rating
the Plaintiff's residual functional capacity ("RFC"). He opined
that the Plaintiff can lift 20 lbs. frequently or 50 lbs.
occasionally. She can sit for five hours at a time and for six
hours total in a workday. She can stand one hour at a time and
for two hours total in a workday. She can walk for 30 minutes at
a time and for one hour total in a workday. Dr. Henderson opined

that the Plaintiff is able to use her hands continuously; use her left lower extremity occasionally and her right lower extremity frequently (for foot control tasks); climb stairs on an occasional basis; and engage in postural movements on an occasional basis.

32. On January 27, 2016 the Plaintiff began seeing Dr. Hurst. The Plaintiff complained of low back pain with left leg radiation that is worsening and for which past treatments have provided no relief. An x-ray of the Plaintiff's lumbar spine showed spondylosis at the L3—S1 discs as well as multilevel disc disease.

33. Dr. Hurst also ordered an MRI of the Plaintiff's lumbar spine, which was taken on February 18, 2016. It showed a small bulge or protrusion at the L3—4 disc; a large left-sided extrusion at the L4—5 disc with diffuse bulging and moderate stenosis; and diffuse bulging of the L5—S1 disc with an 8mm anterolisthesis. Overall Dr. Hurst described this MRI as showing moderate L4—S1 stenosis and disc bulging.

34. The Plaintiff returned to Dr. Hurst on March 30th. She complained of very severe low back pain (rating it as a "10" on a 0 to 10 pain scale) with pain radiating down both legs. Upon physical examination Dr. Hurst observed tenderness in her lumbar

paraspinal muscles and decreased sensation of the left L5 nerve. He diagnosed herniation and prescribed ibuprofen and Tramadol.

35.    The Plaintiff testified at the hearing held June 23, 2016. She alleged disability due to low back pain that radiates down her left leg. She first experienced low back pain in 2001. It worsened in 2008, and it became severe in 2012. Despite accommodations such as going to work later in the day and going home to rest, her back pain forced her to quit work altogether in March 2013. She also alleged weakness in all of her extremities including upper extremities, and she alleged ankle and leg swelling. She alleged a pronounced degree of impairment that limits sitting, standing, or walking to 30 minutes or less each. She must lay down for two to three hours a day. She has difficulty lifting a gallon of milk. She stays home. Daily life activities are limited to light housework. She relies on her husband to drive. At the time of the hearing the Plaintiff was 51 years old.

36.    Also testifying at the hearing was an orthopedic surgeon, Dr. Schosheim, who appeared as a medical expert. He did not examine the Plaintiff but rather reviewed the medical record. Dr. Schosheim opined about what the medical record shows, and he also rated the Plaintiff's RFC.

37.    The ALJ limited the disability consideration to the
time period ending March 31, 2013. At Step Two of the disability
analysis the ALJ found the Plaintiff to have the severe
impairments of "obesity and low back pain due to degenerative
disc disease with mild spinal stenosis at L4—S1 and
spondylolisthesis (slippage)". The ALJ did not find the
Plaintiff to be wholly disabled, however. The ALJ found her
still capable of performing sedentary work. Citing the testimony
of the Vocational Expert ("VE") who also testified at the
hearing, the ALJ found the RFC for sedentary work that he
assessed to preclude the return to her past work as a printer.
The ALJ next considered the availability of other more amenable
kinds of work. The ALJ found Rule 201.19 of the Medical-
Vocational Guidelines ("Grids") to direct a finding of not
disabled for a person of the Plaintiff's RFC and vocational
profile.

## DISCUSSION

38.    Judicial review of the Commissioner's decision is
limited to a determination of whether it is supported by
substantial evidence and whether the proper legal standards were
applied. See Lewis v. Callahan, 125 F.3d 1436 (11th Cir. 1997).
Supporting evidence need not be preponderant to be substantial
so long as it amounts to more than a scintilla; in other words,

it is such relevant evidence that a reasonable person might accept as sufficient and adequate to support the conclusion reached. See id. at 1440. If the decision is supported by substantial competent evidence from the record as a whole, a court will not disturb that decision. Neither may a court re-weigh the evidence nor substitute its judgment for that of the ALJ. See Wolfe v. Chater, 86 F.3d 1072 (11th Cir. 1996). See also, Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002). While the Commissioner's factual findings enjoy such deference, a court is free to review the Commissioner's legal analysis and conclusions de novo. See Ingram v. Comm'r, 496 F.3d 1253, 1260 (11th Cir. 2007). See generally, Jordan v. Comm'r, 470 Fed.Appx. 766, 767-68 (11th Cir. 2012).

39. The Plaintiff disagrees with the adverse Decision. The Plaintiff argues that she has severe back pain unrelieved by treatment and that the medical evidence does corroborate her allegations. This Court construes the Plaintiff's arguments as questioning whether the RFC that the ALJ assessed accurately reflects the degree to which her back condition limits her ability to work. This Court answers that question below.

40. This Court notes that the Plaintiff began complaining of severe pain in March 2008 and specifically of low back pain with left leg radiculopathy. The objective medical evidence

confirms the presence of an underlying medical condition
reasonably likely to cause the alleged pain. MRI's show problems
with three lumbar discs (although there is no uniformity between
those MRI's over whether the disc problems are either bulges,
protrusions, or herniations) with L5 nerve involvement on the
left side. Nerve conduction studies confirm the presence of left
leg radiculopathy. Lastly the physical examinations consistently
show at least some manifestations of low back pain. The ALJ
acknowledges this, both in his "severe impairment" findings at
Step Two and in his statement that "the objective findings
indicate degenerative disc disease of the lumbar spine and
chronic radiculopathy".

41.   The next question is whether those conditions create
the same degree of pain-related impairments that the Plaintiff
alleges. The Plaintiff alleges that the pain eventually
precluded her from continuing with her printing business---and
the ALJ agrees with her. The ALJ found the Plaintiff's RFC to
preclude her return to her past work. That work was exertionally
demanding, involving medium exertion work the VE testified. The
ALJ therefore had to determine next whether the Plaintiff's pain
complaints also preclude less exertionally jobs at the light or
sedentary levels. The ALJ found that the Plaintiff still can
perform sedentary work.

42.    The dispositive question therefore is whether
competent, substantial evidence supports the ALJ's finding that
the Plaintiff remains capable of performing sedentary work.
Having independently reviewed the record evidence, this Court
finds such support. In March 2008 the Plaintiff entered a brief
period of intense pain treatment that ended in July 2008. The
nature of that treatment was intense in the sense of very strong
pain medications, and it ended that July with the transition to
a milder pain medication regimen. That milder pain medication
regimen remained constant for the entire rest of the treatment
history. Moreover it remained the primary form of treatment, and
with the exception of a few rounds of therapeutic injections, it
remained the sole form of treatment. The medical record does not
show the pursuit of other forms of treatment such as physical
therapy or surgical intervention. Nor does the medical record
show objective worsening of the Plaintiff's lumbar degeneration.

43.    She continued to work for the next several years and
during that span of time, she mentioned pain-related impairments
only twice. In October 2008 the Plaintiff reported to Dr. Wani
difficulty with physical activities and prolonged sitting, and
in October 2012 she told Dr. Rauchwerger that increased work
activity had caused her pain to increase.

44.    A month before she quit working, she began treatment with a neurologist, Dr. Guo. By this point the Plaintiff also began complaining of neuropathy in her hands, but testing was negative. No underlying medically determinable condition has been diagnosed and verified that would explain her upper extremity pain complaints. At this Court's hearing, this Court adds, the Plaintiff stressed only low back pain.

45.    The Plaintiff consistently complained of low back pain and radiculopathy down her left leg, and the various treating doctors' physical examinations generally observed at least some pain manifestations, either orthopedic or myofascial in nature. However no treating source has expressed an opinion about the Plaintiff's degree of impairment much less whether she has a disabling degree of pain-related impairment.

46.    The only opinion about the Plaintiff's functional abilities from an examining medical source comes from Dr. Henderson who evaluated the Plaintiff on a consultative basis. Dr. Henderson conducted a physical examination of the Plaintiff. Dr. Henderson reported observing more functional impairments than what the treating sources observed during their physical examinations of the Plaintiff. (Nor was the emotional distress that the Plaintiff was in at that time observed by the treating sources.) Dr. Henderson translated his physical examination

findings into a rating of the Plaintiff's RFC. Dr. Henderson
rated the Plaintiff as less functionally able than what the ALJ
assessed (albeit not substantially less). However Dr. Henderson
rendered his report well after the Plaintiff's date last worked
and well after her date last insured. Over the intervening years
the range of the Plaintiff's medical complaints had expanded,
and that changing nature during the later years limits the
relevance of Dr. Henderson's report to the time period in
question. Consequently the ALJ did not err when he gave less
weight to Dr. Henderson's report.

47. The record also contains the testimony of the medical
expert, Dr. Schosheim. Dr. Schosheim gave his opinion based on
his review of the medical record and on his experience as an
orthopedic surgeon. The relevant MRI's and nerve conduction
studies, Dr. Schosheim opined, confirm the presence of lumbar
pain and radiculopathy. Dr. Schosheim made accommodation for it
by limiting the Plaintiff to sedentary work with a sit/stand
option. However he did not consider that underlying medical
condition to be severe, relatively speaking. Dr. Schosheim
described both the disc abnormalities and the Plaintiff's pain
medications in relatively non-severe, mild terms. Therefore, to
the extent it corroborates other facets of the record evidence,
Dr. Schosheim's testimony does support the ALJ's analysis and

RFC assessment. However this Court does not find his testimony dispositive. He did not examine the Plaintiff, and a claimant's RFC ultimately is a matter reserved to the ALJ, as the fact-finder, to assess.

48. The ALJ also considered the non-medical evidence of record. The ALJ noted how the Plaintiff continued to work for several years after the pain exacerbation event in March 2008. The Plaintiff explained that she needed the income, and certainly the attempt to stay at work despite a medical impairment does not necessarily contradict a disability claim. Still it remains a relevant point, especially where the medical record during those subsequent years of continued work suggests adequate pain control. Moreover there is no record evidence that the Plaintiff attempted to obtain a less physically demanding job. All the record shows is that she moved to Florida soon after closing her printing business.

49. This Court therefore finds that the record contains competent, substantial evidence to support the RFC for sedentary work that the ALJ assessed. Stated differently, this Court finds competent, substantial evidence to support the ALJ's analysis that while the Plaintiff does have a significant pain condition, significant enough to prevent her return to her past job, it is not so severe as to preclude all types of work.

50. This Court lastly notes that the ALJ did not consider the Plaintiff's pain allegations under the SSR 16—3p standard. See also, Hargress v. Comm'r, 883 F.3d 1302, 1307—09 (11th Cir. 2018) (providing a discussion of SSR 16—3p). SSR 16—3p came into effect on March 28, 2016, and the ALJ rendered his Decision afterwards, on August 3, 2016. Instead the ALJ applied the previous standard of SSR 96—7p. Nevertheless, despite that apparent error, this Court sees no reason for remand. This Court has compared the ALJ's analysis against SSR 16—3p, and after doing so this Court finds the ALJ's analysis to comply with SSR 16—3p in substance.

## CONCLUSION

51. It is not for this Court upon judicial review to re-weigh the evidence or reach findings of fact anew; such is the responsibility of the ALJ as the fact-finder in this case. In other words Social Security law does not permit this Court to make its own decision about whether to grant or deny the Plaintiff's disability application. Social Security law instead limits the scope of consideration to reviewing the ALJ's decision on appeal. This Court's review is limited to ensuring that the ALJ's findings of fact are supported by competent, substantial evidence and that the decision comports with the governing law and regulations. Social Security law thereby

requires a certain degree of deference to the ALJ's decision.
Having reviewed the parties' arguments and having independently
and carefully reviewed the whole record, this Court finds the
decision to have such support, with no grounds warranting
reversal or remand.

It is therefore,

**ORDERED AND ADJUDGED** that the Plaintiff's Motion for
Summary Judgment (DE 16) is **DENIED**. In affirming the ALJ's
decision, the Defendant's Motion for Summary Judgment (DE 18)
therefore is **GRANTED**.

**DONE AND ORDERED** in Chambers at Fort Pierce, Florida, this
26ᵗʰ day of September, 2018.

Shaniek Maynard
SHANIEK M. MAYNARD
UNITED STATES MAGISTRATE JUDGE

CC:  Carlos J. Raurell, AUSA (via CM/ECF NEF)

Patricia A. O'Brien, pro se
1817 SE Dranson Circle
Port St. Lucie, FL  34952